Who's that? Good morning, Your Honor. May it please the Court. The two issues on appeal in this case have to do with whether the lower court correctly assessed Ms. Allen's protected activity and whether the sexual harassment was sufficiently pervasive to survive summary judgment review. Now I'm going to begin with the retaliation claim first because I think it's the most pertinent one. Now, the protected activity issue itself is a confluence of really five elements. It has to do with opposition to wrongful conduct, it has to do with awareness of this conduct to the employer, it has to do with attribution, and then the subjective and objective qualities, whether or not the individual who's opposing this wrongful conduct understands truly and reasonably that this is something that's wrongful and whether or not the prevailing law allows for this to be a reasonable conclusion. Now, the protected conduct itself where the lower court found it wanting was on these opposition and awareness elements. And what it said essentially is that on page 41 in this final report and recommendation is that there was no opposition on behalf of Ms. Allen. But you're relying on the August 6th letter? That's correct. Well, so, Judge Hugg, there are... Is that what you're relying on in terms of reporting sexual harassment? There's a June 30 conversation, which is one reporting that was done orally to Ms. Ortiz, which is the 51% owner, and then there's the August 6th letter that followed that kind of gave more detail. So there's an actual response to the complaint of Ms. Ortiz against your client? The August 6th is a response to a... There is a complaint against your client, but her behavior, right? That's how it started. I'm sorry, I can't hear you. Originally, Ms. Ortiz complained about your client's activities with regard to her husband, and never met him, right? Ms. Ortiz was not the one. Whoever engaged the conversation at first, Ms. Ortiz asked Ms. Allen to have a discussion. I'm talking about the August 6th document. Right, so Ms. Ortiz filed... Was that initiated by the company, Ms. Ortiz? The August 6th was initiated in written form as a disciplinary notice to Ms. Allen. It is set forth based on claims that the company had against your client. That's correct. And then your client then filed a written response. That's correct. Where in the response would a reasonable juror determine that this is a claim that I'm being sexually harassed? The language. The language itself. So there's opposition language within the actual complaint. The August 6th letter on the back, she wrote the word that she's the one who's been involved in sexual harassment. The language itself is not required or prerequisite, but that is a reference to wrongful conduct that has just been discussed a week prior in the June 30th meeting between Ms. Ortiz and Ms. Allen, where she went into detailed information about what was going on and essentially trying to keep her job, essentially trying to preserve their friendship. I understand. Go ahead. Where in the response is it specified? Is it set forth that I have a complaint that I'm being sexually harassed by Mr. Ortiz or anybody else? The language itself is the sexual harassment language. It's not explicit in regards to I'm complaining of sexual harassment, but she indicated to Mr. Ortiz, based on a number of other things in that letter, that she does not want to be involved in any sexual harassment. Should we be evaluating that term? Should it be considered a full contact response? The full contact response is a part of the question. Now, there's also surrounding context that allows the employer to be aware that there's been a complaint filed against them. Now, the courts have said that formal and informal complaints are sufficient. And you can have information that's been brought to the employer's attention that virtually always shows there's been opposition to wrongful conduct. Now, there's a deposition, an affidavit by an individual who was Ms. Allen's supervisor named James Hamrick. And in his affidavit, he said in no uncertain terms that Ms. Ortiz, during this June 30th, August 6th week, came to him and said, I want you to fire Ms. Allen. And he told her explicitly that we cannot fire her because she has complained of sexual harassment. And Ms. Ortiz turned around and told him, then we won't tell her the real reason. The reason they came up with was essentially that there's been some kind of inconsistency between the June 30th meeting, which has no recording, there's no information that can verify that, and the August 6th information letter that Judge Huggins was just mentioning. Now, that is not the only proof for awareness, but that does show that Ms. Ortiz was aware that there's a sexual harassment claim being brought to her doorsteps. But please explain, I mean, you've pointed to the August 6th letter, and you've pointed to the prior meeting, and she did use the words sexual harassment, but where has she made the accusation that she's a victim of sexual harassment? Regarding the language itself in the letter, saying I do not want to be involved with sexual harassment, there's no explicit language in the actual letter itself. Now, there's a surrounding context regarding her actually discussing this, that she already was. First, what's interesting is the actual language that she uses. Holding aside the meeting, and we're just looking at the response, the written reply, it reads to me like an apology and a defense, rather than a complaint. And the real question is whether there's enough here to suggest that a jury could find that it amounted to a complaint that fell into the opposition category. Conversation. Regarding the specific incident, she says, that conversation with Santos was not brought up by me. A song came on the radio where the female said blah, blah, blah. Santos asked me if my boyfriend blah, blah, blah. He didn't ask anything else. It appears that's the first time Alan described the incident. Then she goes on to say, even though it seems that you have this idea of me being attracted to him or wanting him, which I said, which I could be wrong, but I don't, just like I told him I love my boyfriend, blah, blah, blah. It isn't important to me, referring to oral sex. And then she comes, I didn't come here to jeopardize my job or your marriage. I'm not that type of female at 28. I still have no intentions to be. And then you come to the following paragraph, sort of the penultimate. I enjoy working here. I'm in no place to be involved in any sexual harassment or marital issues that can easily be avoided. That reference looked to me as if she's saying, she's not talking about herself filing a complaint of sexual harassment so much as saying that she's not involved herself in conduct that could be characterized as sexual harassment. And then she finishes up with, I enjoy working here and I'm in no place to be involved in any sexual harassment or marital issues that can easily be avoided. So you've got to be able to say that those words could be found by a jury reasonably to suggest that she was objecting, that this was an opposition, that she put him on notice. It could be informal. It doesn't have to be formal. There's no magic to the words. But does this fairly put him on notice that she's objecting to the misconduct that she thought occurred there? Judge Marcus, two things about her response. Yes, we believe that is sufficient to put him on notice because it was not stated in a vacuum. Mr. Ortiz already had a conversation with Ms. Allen. There's a history of Mr. Ortiz doing this to other individuals. And so the issue itself was already a sensitive issue based on how Mr. Ortiz responded to the complaint, saying it's outlandish, it's disturbing, it's lies. She brought it to Mr. Ortiz's attention, who also understood it was a complaint of sexual harassment. He admitted this during his deposition. And he's called it a fabrication. And then after she was fired, she sent a text to the employer saying that some of the things that your husband has done could be constituted sexual harassment. So taken in the vacuum, if we just look at the language of the August 6th letter, if there's ambiguity... You would say the letter alone would not be enough to state a claim for opposition. The letter alone is ambiguous, and we can see to that, but we also... I understand it's ambiguous, that's not my question. If all you had was the letter, would that be sufficient to beat back a summary judgment order? It would be... Would that create a material issue of disputed fact for a jury? It would because the non-movement party gets the benefit of the doubt when there's ambiguity. And the lower court admitted there's ambiguity, but the lower court characterized the letter in accordance to friendly relationships that Ms. Ortiz and Mr. Ortiz had with Ms. Allen. Now, it's a close case, much closer case in that situation. But because the standard review is so differential to the non-movement party, that ambiguity raises concerns that the judge would have to weigh credibility and would have to neglect James Hamrick's testimony. Now, this court in Fulcron had a number of affidavits that were dismissed by the lower court, and it essentially said that it's a reversible error if some of those affidavits with no legal basis was excluded if they were material. Therefore, they're not harmless. In this case, we know that Mr. Hamrick testified that Mr. Ortiz was well aware that there was a sexual harassment claim being filed. She acted on that information by firing Ms. Allen, coming up with a different reason for it that was completely unverifiable, and then in the process itself showed through the record that she has had a sensitivity to these issues. Ms. Allen had to bring... When... Oh, go ahead. When... You said Mr. Ortiz was well aware of these allegations. When was he aware? Well, he was aware when he was sexually harassing Ms. Allen and when she was... No, but you have a witness who's saying Mr. Ortiz is well aware. At what point? At what point? Because certainly you have the August 20th text that came after she was fired. When does this witness say that Mr. Ortiz supposedly became aware of these allegations? Somewhere between August 6th and August 10th, whenever Mr. Ortiz brought the letter to Mr. Ortiz, showed him the allegations, and he told her it was a fabrication, August 10th came, that's when Ms. Allen was fired, and then the text that you referenced came through in regards to their awareness of the situation. You're not claiming that the August 20th text in any way supports the retaliation claim, correct? No, and the lower court was correct in regards to that as being too late, but it does show that there is a linear connection between the earlier claim of Ms. Allen and then her post-termination idea of what was going on, and the awareness runs throughout this entire history. Well, it shows that as of August 20th, post-termination, she had made that allegation, but the text, the August 20th text, is not shedding light on what has happened before termination. It reflects of what has been happening. That is an indication of what's been in the actual record, the written record. There's the August 6th letter, and then there's the text messages. Prior to that, there's been conversations that have been happening between Ms. Ortiz and Ms. Allen to give Ms. Ortiz sufficient information to know there's something going on, there's wrongful conduct, and I need to take a step in order to rectify it. Unfortunately, the decision she had made was to get rid of the employer instead of to start some kind of investigation into her husband's conduct. Do you want to take just a moment to address, or do you want to just sit on your motion and your briefing on the severe or pervasive prong? If I may take a minute on the severe or pervasive prong to explain where I'm going with this. So, our main contention with the sexual harassment issue is that it cannot be taken in isolation based on number of incidences. Now, there are no magic number of incidences that raise the threshold required for pervasiveness. Your position is not that it was severe, but that it was pervasive? That's correct. And we're saying that the pervasiveness itself has to be tested in accordance to the entire social context. Now, the Supreme Court itself has explained this well, and on KL, when it asks courts to look at surrounding circumstances, expectations, and relationships, and not to simply focus on the words used or the physical acts performed, our contention here is that the pervasiveness itself was matched by two aggravating factors. The psychological well-being of Ms. Allen, she became suicidal through this whole process, and she tried to seek help from Ms. Ortiz, and she essentially told her to pull the trigger, and the fact that there was no other reporting mechanisms. There was an affidavit from another employer who says that in her entire career, she's never seen another employer that had essentially no method to report wrongful conduct. The only person who Ms. Allen could speak to was the harasser's wife, and because of that, she feared retaliation, and when she did finally come forward, she was retaliated against and fired. You agree there's a subjective component to the sexual harassment claim, correct? Yes. So, we can look at the entirety of the circumstances to see if she, during the course of the conduct that's at issue, she was participating in banter or anything of that nature. Isn't that correct? There was a time where she was more amicable to the responses because she was trying to keep her job. One of the things she testified, Judge Branch, is that she didn't know what type of individual would come to work that day, if Ms. Ortiz would be the more gentle individual who would be caring for her, or if he would be the harasser, and so she had to come to work guessing, in her environment, with no one to report to, what kind of individual she would have to deal with on a day-to-day basis. Sure. You indicated with regard to the retaliation claim, it was a close question, right? Just the letter. Just the letter. If we all look at the four corners of the letter, and that's all we have is the language, it's a closer issue than if we consider the totality of circumstances. I've seen you read the letter, which is a precursor to the same type of discussion that was set forth in the letter. I'm not reading the testimony, but the second issue we just discussed, that is the actual sexual harassment claim. Whether you're right or wrong, some judge is right or wrong, we agree it's a fairly close question. In regards to the severe and pervasive? Yes. Based on the standard of this court, it's very close, because we have to incorporate the aggravating factors. I'm curious about the next claim you have that seems to be criticized in the Northern District of Georgia, saying that they violate constitutional rights on the frequency in which those judges grant certain judgments. Are you still maintaining that claim? We maintain it. And you said that you consider both of those other claims to be close questions? Yes, Your Honor. Okay. Thank you, and you have reserved your full four minutes, counsel. Good morning. Good morning, counsel. I'm going to go ahead and, I think, start with the sexual harassment and just kind of get that out of the way. I think that we can all agree that the standard in this circuit is pretty clear, and in this case, this is not the case to change that or make a substantial change in the standard, because what the plaintiff is asking you to do in this case is to drastically lower the bar for what constitutes pervasive sexual harassment and, in essence, to encompass virtually any kind of boorish comment, if you will, and I think that would be a clear break in this court's precedent, and I would refer the court to the cases that we cited in our brief where the Eleventh Circuit has found even direct offensive touching in some of these cases is not enough, and there's no question in this case that there was no touching. The plaintiff admitted that on 229. Well, we have the oddity of Santos speaking to a four-year-old, and then the four-year-old pats her on the fanny twice. We do, but, Your Honor, I will say that Ms. Allen admits that she has no idea what Mr. Santos said to his son because he was speaking in Spanish, and I would point the court to page 221 of the plaintiff's deposition. And, indeed, when she was asked how she reacted, were you offended, she said she was confused. Right, but she also said, I'm sorry if I believe it's at the same place where she says, I had no idea what he was telling the boy because he was speaking in Spanish. All I knew was the boy came up and did that, and then he left. But the other thing, Your Honor, that I think it's important to note is she also says that that happened to men. I'm sorry. Can a juror reasonably assume that a conversation between the father and the four-year-old boy leads to the four-year-old boy patting her on the buttock not once but more than one time? I think it was twice. Can you draw that inference? I think you could draw that inference, Your Honor, but I would also point the court to the testimony where she admits that he did that with male employees as well. So, there's nothing to indicate that that is sexual in nature as opposed to joking around and playfulness in the workplace. So, I would point the court to that. That's on page 223 of her deposition where she says that he did the same thing with men. So, again, my point there would be that's hardly sexual. She also claims there's no propositioning in this case. And, of course, the touching by the son, even if that is a touching, is not, and again, I don't believe that to be sexual, but it's not anything like the touching that the courts have rejected in some of the other cases where they found that it was not severe or pervasive. I would point the court to Johnson for an example of that. I don't think anybody would argue that alone was sufficient, but it's a series of those similar incidents that creates the potential of sexual harassment. Well, Your Honor, I would disagree that taking everything that she's got in this case, that it would rise to the level of sexual harassment, particularly in the context where she But he agrees it's not severe. So the only issue is he's traveling on the ultimate prong of pervasive. And he says you had ten incidents in four months. Well, and some of those instances, she's admitted, are not offensive. So, you know, some of those she said confused her. Some of those I do not believe a reasonable jury could find to be sexual in nature, such as the chocolate milk conversation. Even she said, you know, the thing that bothered her the most was that it came after hours. Well, of course it did because they'd been out, you know, to the gym to work out. And then he had the chocolate milk later. It wasn't just chocolate milk. It was the icon that came with it. The tongue emojis. Yes. Yes. Could a jury not reasonably infer that that was a sexual innuendo? I don't believe Given the nature of the parties? I don't believe so. I mean, people use tongue emojis all the time. And I may not believe so. But may a jury reasonably infer that? I don't think so. I don't think so. I think people use those all the time. I also find it interesting that she didn't produce them. What if I just, in reading that, reacted that way? If I did that, would I be able to say, well, since I reacted that way and interpreted that way, a juror could reasonably do the same thing? Well, I think just because one person might. I don't think a reasonable juror is each individual person. And that's why we have objective and subjective criteria, is because one person can have a reaction. I understand that. But as a human being, if I have that reaction, can I then say that it's reasonable that another reasonable juror, or a reasonable juror, would have that same reaction? I believe you could say that, Your Honor, yes. But, again, I think it's got to be objective and subjective for the very reason that each individual person is not a reasonable juror necessarily. Of course, some of these. No, go ahead. This may be the strangest question I ever ask an oral argument, but because she did not produce the text message, do we know which tongue emoji this was? We do not. Okay, because there's more than one. We do not. We do not. And so, again, you know. And that was an after-the-fact add-on claim as well after her termination, something not brought up. I take it you would concede that some of these comments are plainly sexual in nature, crude and offensive. Your argument has to be it just wasn't enough to be severe or pervasive. Or have I misapprehended your view? I'd have to look at each one of them. I believe that there may be one or so. After hearing a song with the lyrics, quote, eating booty like groceries, Santos asks Alan, does your boyfriend eat that thang? Using a euphemism for oral sex, Alan answered that her boyfriend did not and did not know how to do so. Santos answers that he could teach the boyfriend how to do so, saying, quote, I could teach him. That would be sexual in nature. The question is whether it's offensive. She claims it is. But, you know, to say someone looks fine as hell and she takes it as a compliment, given the context of this case and how she's been and has been. Then Santos tells Alan, quote, she had a body like his ex-girlfriend but better, with wider hips. Then on another occasion, Santos points to Alan's groin area, which was wet with sweat, and he commented, damn that thang get wet. And then you have an instance on one occasion when they're moving a patient and Santos says to Alan, you got to watch that stuff on that table with that big butt or you're going to knock it down trying to move her. Some of this stuff is over the line, isn't it? Some of it might be, but I believe you have to take it in context. If you look at the comment about the butt, for example, which she never complained about, even in her post-termination email, that came out only at her deposition. She says it was a joke. If you look at her deposition, she said he was joking to me about that. So the same thing with even the workout situation. I think you have to take those all in context. I mean, she's saying we're working out. I've got Saran Wrap around my stomach and I'm sweating. And he says that, again, it has to be offensive. And I think if you take all of the comments in context, in this case, they're not pervasive enough to justify lowering the bar that this court has set as to what constitutes sexual assault. No, that I understand. That argument I understand, that they're too few and too far between. There just isn't enough and they just don't amount to anything coming close to what we talked about in Mendoza v. Borden. But it seems to me indisputable that some of these are crude, offensive, and sexual in nature and it's hard to dispute that. I would agree with you that some of them are, but not all of them. And I also would urge the court to look at the context. Tell us about the opposition theory. Yes, sir. In their papers, they said that there were two complaints that were made. They initially said that the July 30th meeting, that that was a complaint made there, and then the August 6th letter. I believe they may have conceded that the July 30th meeting is not a complaint. I'm not certain, so I'm just going to address that. I think it would probably be fair to say that they want you to look at it holistically. You have to consider context, which means you necessarily had to consider the colloquy on July 30th and then get to the critical letter. And the plaintiff in this case admits that she made no complaint of sexual harassment on the July 30th meeting. She says, I gave no specifics at page 155. She says, I didn't say anything at page 175. She says, it was not really a conversation. I was just listening at page 144. She said, in essence, most, she didn't say all, things were started by Santos at page 155, which is an explanation, not a complaint. She thought Rita was, Ms. Ortez, was overreacting, she says, at page 147, 178, and 120, so she repeatedly says that. She said, basically, at the July 30th meeting, nothing happened, nothing was going on. She says that at 142, 143, 146, and 156, which is not a complaint, Your Honor. So there's no indication anywhere in the record that she complained of anything in that meeting, much less complained about Mr. Ortez doing anything to her. So that gets us to the August 6th letter. And the only thing Rita knew, or Ms. Ortez knew, at that point was what was in the letter. And that's at page 177. She admits that because she said nothing in the July 30th meeting. And if you look at, if you take it in that context, the only thing that Rita, Ms. Ortez, is operating on is what's actually in that letter. And in the letter, she admits that what she was doing was trying to say to Ms. Ortez that you're overreacting and I'm not after your husband. And if you look at page 178 of her deposition, that's exactly what she says. What I was trying to do with this letter was to tell Ms. Ortez that she was overreacting and I'm not after her husband. So that's not a complaint about what Mr. Ortez is doing to her. What about the testimony that Santos was aware that he was being accused of sexual harassment after this letter? Opposing counsel had mentioned that he was on notice and that he knew there was a sexual harassment allegation against him after this letter, the August 6th letter. Well, I think exactly what the district court and the magistrate court said about that, Your Honor, and that is that a layperson is not going to get to make that decision because people use those kinds of terms all the time. And that doesn't change the outcome of what the court must decide as to what is and isn't. Simply because we don't let experts do that, much less a layperson. And again, I think as the lower court pointed out, English is not his first language. So I don't think that gets us over the hump, so to speak, as to whether this constitutes any kind of protected activity. I would also like to say— Can I clarify something for me? Because instead of using the first names for Mr. and Mrs. Santos, Ortiz, I couldn't tell who was being told what. Is there something in the record, and I ask counsel for the plaintiff also to answer this question, was that comment made to Mr. Ortiz Santos or to Mrs. Ortiz Rita? About? About he knew, he admitted. It wasn't made to anyone. I think what he testified to in his deposition was he was asked something along the lines of, when did you first know there was a complaint against— I understand that, but the co-worker's comment. I would urge you to read— That related to Mr. or Mrs. Ortiz. And I'll ask you to— The co-worker's declaration does not say anywhere in there that that co-worker saw any sexual harassment between Ms. Allen and Mr.— No, no, the question is whether there was an admission of sexual harassment. I think the declaration said something to the effect of why Ms. Ortiz was going to fire her, and he said you can't fire her for that, and she said I won't tell her the reason or something like that. But I don't believe there was an admission that it was sexual harassment. I don't have that in front of me, Your Honor, and it's a short declaration, so I'd urge the court to look at it, but I don't believe any of the declarations in this case say anything about I saw Mr. Ortiz doing anything with the plaintiff in this case. That's not the issue. The issue is whether there was a claim made to Mr. Ortiz. In other words, if Mr. Ortiz or Mrs. Ortiz said, I didn't see it, but it happened, or at least Ms. Allen said it happened, and that put us on notice. Who was the decision-maker here? Ms. Ortiz was the decision-maker, so it's what she knew and when she knew it. And what she knew and when she knew it was what's in that letter, and there's no question about that. There's no indication that the plaintiff in this case provided any additional information in the meeting that was not in the letter, and that's pretty clear from her deposition. She says, I told her everything I wanted her to know, I put in that letter. And, again, I'll say that that is on page 177 of the deposition. The letter, if I just have a couple seconds left, says, I won't discuss my personal life anymore. I won't. That's not a complaint about what Mr. Ortiz is doing to her. She's saying what I won't do. She says, four months ago this song came on. I think we dealt with that response. Okay. We'll have to ask you to bring your remarks to a conclusion if you could, counsel. Certainly. The only thing I would say here is the mere fact that someone mentions the word sexual harassment, particularly in the context of I'm in no place to be involved in any sexual harassment or marital issues that can easily be avoided, where the recipient of the letter thought that the person was discussing sex with her husband and hiding it is simply not protected activity under the law of this circuit. Thank you. Thank you very much. Thank you. First of all, regarding the co-workers, there's Mikkel Britt who actually testified in her affidavit that she did see Mr. Ortiz making strategic moves to be near Ms. Allen, to approach Ms. Allen. She also suffered the same type of treatment. Who is the decision maker in this? Mr. Ortiz is the decision maker ultimately. Rita? Yes, sir. All right. What evidence is there that other than the letter or the response of August the 6th in the meeting on July the 30th that she was put on notice that a claim was being made that she was being sexually harassed? She was put on notice. So there was an entire history of Mr. Ortiz doing this. She already knew this history because of the way she responded. That's one thing. That goes to the sexual harassment. But she was put on notice that your client specifically said, I am objecting to sexual harassment. The notice itself, if we're going to talk about awareness, was August 6th was the explicit complaint. She was preempted to this complaint during the July 30th meeting. In addition to the response, August the 6th, and the conversation of July the 30th, what else is in the record that suggests that she was actually put on notice of a claim of sexual harassment? Outside of our own experience, outside of the other coworkers and affidavits, there's nothing explicit that said that she knew beyond a reasonable doubt that her husband was doing this to specific individuals. Now, she knew he had a history of it because she testified that he was a weak man and that there was a history of Mr. Ortiz doing this to other employees like Mikhail Britt, like a – I think her name is Chandra Tiller. But wait, that may be true. Doesn't your client have to make a claim, say, I've been sexually harassed and I want to stop, or something of that nature? The August 6th letter is the explicit final complaint. Okay, so you're relying on the August 6th letter. We're relying on the August 6th letter in the culmination of everything that's happened prior to that, and it's confirmed with a text message after that. So looking at the letter in a vacuum itself is going to be very difficult to ever have an awareness aspect because if the letter itself and the language in the letter is going to be all we're looking at, we're ignoring the entire social context for when this is happening. When you say that she was aware that her husband had done that with other employees, is that simply affairs or sexual harassment? Those are very different things. Sexual harassment. And the way he was approaching other coworkers during business hours, the way he was positioning himself next to Ms. Allen, and her response to Ms. Allen's complaints was essentially one where I know he does this kind of thing and I'm sensitive to it and I need to get rid of any threat. But there's a problem because James Hancock himself testified that Ms. Ortiz came to him with the need to get rid of Ms. Allen based on her sexual harassment complaint. So it's possible that based on that testimony, she was well aware prior to even the August 6th letter. When you say positioning himself next to Ms. Allen, you mean that he was trying to stand near her in certain circumstances? He was putting himself on the scheduled shifts with her. He was positioning himself next to her physically. He was doing it with other employers as well, trying to push them into his body during pictures. And so there's a pattern of this type of concentrated attempts to be near the employers in a physical, almost intimidating way for them to respond to him. And Ms. Allen was aware of that. Ms. Ortiz was aware of that based on how she responded to the July 30th conversation and then based again in regards to her bond disciplinary notice and then firing Ms. Allen. Thank you. Thank you very much, counsel. Thank you both. We'll take the case under advisement. And we'll proceed to the next of our cases.